JS 44   (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a)  PLAINTIFFS

Joshua Nuncio, Daniel Snyder, Kira Allen, Maxamillian Lewis, Brent Esposito, Melanie Cheney, and Ashley Seibert

**(b)**   County of Residence of First Listed Plaintiff    Erie
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)**   Attorneys *(Firm Name, Address, and Telephone Number)*

A. Nicole Hallett
507 O'brian Hall, North Campus
Buffalo, NY 14260

## DEFENDANTS

Delaware 483 LLC, dba Rowhouse Bakery & Restaurant, Mark Jaworski, Sean Tuohey, and Myriah Jaworski

County of Residence of First Listed Defendant    Erie
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government
  Plaintiff
- ☐ 2   U.S. Government
  Defendant
- ☒ 3   Federal Question
  *(U.S. Government Not a Party)*
- ☐ 4   Diversity
  *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                  *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☒ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | Protection Act |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | Exchange |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 890 Other Statutory Actions |
| | Medical Malpractice | | Leave Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | State Statutes |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from Another District *(specify)*
- ☐ 6   Multidistrict Litigation - Transfer
- ☐ 8   Multidistrict Litigation - Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 USC 201-219

Brief description of cause:
Unpaid wages and benefits.

## VII.  REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes   ☒ No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE                                       DOCKET NUMBER

DATE
11/29/2018

SIGNATURE OF ATTORNEY OF RECORD
/s A. Nicole Hallett

**FOR OFFICE USE ONLY**

RECEIPT #              AMOUNT                  APPLYING IFP                  JUDGE                  MAG. JUDGE

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44**

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**  **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**  **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**  **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**  **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**  **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**  **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**  **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

_____

JOSHUA NUNCIO, DANIEL SNYDER,
KIRA ALLEN, MAXAMILLIAN LEWIS,
BRENT ESPOSITO, MELANIE CHENEY,
AND ASHLEY SEIBERT,

<em>Plaintiffs,</em>

v.                                                                          November 29, 2018

DELAWARE 483 LLC,
dba ROWHOUSE BAKERY & RESTAURANT,
MARK JAWORSKI, SEAN TUOHEY,
AND MYRIAH JAWORSKI,

<em>Defendants.</em>

_____

## <u>COMPLAINT</u>

1. Since October 2017, Delaware 483 LLC, Sean Tuohey, Myriah Jaworski, and Mark Jaworski (collectively, "Defendants") have owned and operated Rowhouse Bakery & Restaurant ("Rowhouse"), an upscale dining establishment in the City of Buffalo.

2. Rowhouse operates as a coffee shop and bakery by day and hosts numerous private events as well as offers regular dinner service by night.

3. While Rowhouse has garnered considerable positive attention and interest from the media and the public, the restaurant thrives because of illegal employment practices and dishonesty to its patrons.

4. Defendants have continually and willfully violated their employees' rights under both federal and New York state labor law.

5. Defendants' actions show a pattern of disregard for federal and state minimum wage laws as well as overtime regulations.

6. Defendants regularly confiscate and misappropriate employees' tips, require their employees to work off the clock for no pay, fail to pay spread-of-hours pay, and refuse to honor their obligations pursuant to their own employment agreements.

7. When confronted with the illegality of their behaviors, Defendants have responded with either indifference, deceit, or anger.

8. Plaintiffs, seven mistreated former employees of Defendants, bring this action to recover damages caused by these egregious violations.

## JURISDICTION AND VENUE

9. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 206(b), and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

10. Venue is proper pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to this action occurred within this District, and Defendants are located, reside, or do business in this District.

## PARTIES

11. Plaintiff Joshua Nuncio worked at Rowhouse from approximately October 2017 until May 2018. At all relevant times, Mr. Nuncio worked for the benefit of Defendants.

12. Plaintiff Ashley Seibert worked at Rowhouse from approximately March 2018 until August 2018. At all relevant times, Ms. Seibert worked for the benefit of Defendants.

13. Plaintiff Daniel Snyder worked at Rowhouse from approximately August 2017 until approximately February 2018. At all relevant times, Mr. Snyder worked for the benefit of Defendants.

14. Plaintiff Maxamillian Lewis worked at Rowhouse from approximately October 2017 until July 2018. At all relevant times, Mr. Lewis worked for the benefit of Defendants.

15. Plaintiff Brent Esposito worked at Rowhouse from approximately October 2017 until July 2018. At all relevant times, Mr. Esposito worked for the benefit of Defendants.

16. Plaintiff Melanie Cheney worked at Rowhouse on a part-time basis from May 2017 until September 2017, and on a full-time basis from approximately September 2017 until August 2018. At all relevant times, Ms. Cheney worked for the benefit of Defendants.

17. Plaintiff Kira Allen worked at Rowhouse from approximately October 2017 until May 2018. At all relevant times, Ms. Allen worked for the benefit of Defendants.

18. Defendant Delaware 483 LLC is a limited liability corporation registered in the State of New York.

19. Defendant Delaware 483 LLC owns and operates Rowhouse.

20. Defendant Delaware 483 LLC filed a Certificate of Assumed Name to Conduct Business under the name Rowhouse Bakery & Restaurant on March 23, 2016.

21. Upon information and belief, Defendant Mark Jaworski is a member of Delaware 483 LLC and/or was a joint employer of Plaintiffs during the time period in question.

22. Defendant Sean Tuohey is a member of Delaware 483 LLC and the General Manager of Rowhouse Bakery & Restaurant.

23. Upon information and belief, Defendant Myriah Jaworski is a member of Delaware 483 LLC and/or was a joint employer of Plaintiffs during the time period in question.

## STATEMENT OF FACTS

Rowhouse Bakery and Restaurant

24. Rowhouse is a bakery and restaurant operating at 483 Delaware Ave, Buffalo, NY 14202.

25. Rowhouse opened to the public on October 12, 2017.

26. Defendant's website states that Rowhouse is a "café, juicery, artisanal bakery, full-service restaurant, specialty store, and craft cocktail lounge" that serves "gourmet offerings" made from "the finest organic, seasonal ingredients, sourced from Western New York's local farms."

27. Upon information and belief, at all relevant times, Rowhouse had an annual gross volume of sales made or business done of not less than $500,000.

28. At all relevant times, each Defendant, each Plaintiff, and other employees handled, sold, or otherwise worked on goods that moved in or were produced for interstate commerce.

29. Defendants Mark Jaworski, Myriah Jaworski, and Sean Tuohey are joint employers with Delaware 483 LLC at Rowhouse.

30. Upon information and belief, Defendant Myriah Jaworski is a member of Delaware 483 LLC. Ms. Jaworski is an attorney and performs managerial functions at Rowhouse, including but not limited to creating and applying employment policies for the restaurant. These policies include the vacation time policy and the health insurance benefits policy.

31. Ms. Jaworski has the ability to hire, fire, and determine amount of pay, role, and responsibilities of the employees of Rowhouse.

32. Defendant Sean Tuohey is a member of Delaware 483 LLC. Mr. Tuohey is Ms. Jaworski's husband.

33. Mr. Tuohey performs managerial functions at Rowhouse which include, but are not limited to, setting employees' schedules, conducting interviews, hiring and firing employees, setting employees' rate of pay, disciplining employees, and determining the role and responsibilities of employees.

34. An October 10, 2017 article published by "Buffalorising.com," for which Mr. Tuohey and Ms. Jaworski were interviewed, referred to them both as a "proprietors" of Rowhouse.

35. Upon information and belief, Defendant Mark Jaworski is a member of Delaware 483 LLC. Mr. Jaworski is Ms. Jaworski's father, and Mr. Tuohey's father-in-law.

36. Mr. Jaworski performs managerial functions at Rowhouse which include, but are not limited to, hiring and firing employees, setting employees' rate of pay, distributing tips earned by employees, disciplining employees, and determining the roles and responsibilities of employees.

37. At all relevant times, Mr. Jaworski, Ms. Jaworski, and Mr. Tuohey are and were residents of the State of New York.

Employment Practices at Rowhouse

38. During regular service at Rowhouse, customers personally gave tips to the server who individually served their table.

39. With the exception of the first two weeks of Rowhouse's operation, there was no tip pool during regular service.

40. Rowhouse also hosted private events, including weddings, bridal showers, parties, and company meetings. Rowhouse hosted approximately two to three private events per week.

41. Defendants executed an event contract with each private event client that laid out the charges for the events, including food and beverage, set-up fees, taxes, and additional charges.

42. Each contract included what Defendants referred to as either a "gratuity," "service charge," or "administrative fee" in an amount equal to 18% of the bill before tax.

43. 18% of the bill before tax is a customary percentage that customers leave as a tip for service employees at a large event.

44. Defendants switched back and forth between terms for this charge. Initially, the contracts included the term "gratuity" with no additional clarification as to what this charge paid for or how this money was used by Defendants.

45. Defendants then generally switched to the term "service charge" in approximately March 2018. However, there were some instances during and after March 2018 where Defendants still used the term "gratuity."

46. In approximately June 2018, Defendants switched to the term "administrative charge" and added a disclaimer to the bottom of the contract which read

> "Administrative fees are charged to customers to cover Rowhouse's costs associated with conducting these events. This normally include additional set up of the rooms, special furnishings, supplies, extra kitchen labor, cleaning of dishware, clean up of building, and salaries during the event among other items. Administrative charge is not a gratuity or a tip. Gratuity or tips may be directed to servers at your discretion."

47. Prior to adding this disclaimer, Defendants misled customers to believe that the "gratuity" or "service charge" was a tip that would be distributed among the service employees.

48. At the end of one event contract's disclaimer, Mr. Jaworski wrote the following addition by hand: "Our staff is compensated well to support your events."

49. After each event, Mr. Jaworski arbitrarily decided to either not distribute any portion of the 18% "gratuity," "service charge," or "administrative fee" to the employees, or to distribute only a portion of the charge to employees.

50. On occasions where Defendants did distribute some or all of the 18% charge to their employees, they would improperly include other employees ineligible to participate in the tip pool, including maintenance employees and managers.

51. On occasions where Defendants did distribute some or all of the 18% charge to their employees, Defendants would split the portion it decided to give to employees in an arbitrary manner. Mr. Jaworski told employees that he gave them only the portion of the tips that he thought they deserved.

52. Mr. Jaworski also stated to employees that he was taking some of the gratuity or service charge to fund the salaries of two maintenance employees, Mark and Pete.

53. On certain occasions where Defendants did distribute tips from private events to employees, tips were not distributed to employees until weeks after the private event occurred.

54. Private event customers rarely left additional tips for service employees at their events because they believed the gratuity or service charge which they already paid was being distributed to employees as a tip.

55. Rowhouse employees began refusing to work private event shifts they knew that Defendants would steal their tips from such shifts.

56. Defendants paid servers and bartenders a different wage rate depending on if they were working a regular service shift or private event shift.

57. Mr. Tuohey refused to tell bartenders and servers what their hourly rate would be for private events in advance. Mr. Jaworksi decided what employees would be paid for private events after the weekend was complete. The rate Defendants decided to pay bartenders and servers for private events was usually between $7.50 and $9.50 per hour but varied from week to week.

58. At all relevant times, Mr. Tuohey required some employees to clock out after service to customers was complete, but before they were done completing end-of-shift tasks like cleaning up, filling out paperwork, and counting the cash in the cash register drawers. The end-of-shift tasks amounted to approximately thirty minutes per shift.

59. If employees did not clock out before completing end-of-shift tasks like cleaning up or completing paperwork, Mr. Jaworski would move their clock-out times back in the time clock system to the time they began completing the end-of-shift tasks.

60. Mr. Jaworski told employees that he was changing the time clock data so that they would be paid only what he felt they deserved to be paid.

61. Section 4.4 of the Defendant's employee handbook states that "overtime worked without prior authorization will not be paid."

62. Defendants regularly failed to pay employees at a rate of one and one-half times their regular rate of pay for hours actually worked in excess of forty hours if they did not obtain prior approval, even when Defendants knew or should have known that such overtime time hours were being worked.

63. Even when employees obtained prior approval to work hours in excess of forty hours per week, Defendants usually did not pay employees at a rate of one and one-half times their regular rate of pay for hours worked in excess of forty hours per week.

64. Instead, such hours were sometimes paid at the employee's regular rate of pay and at other times, not paid at all.

65. Defendants did not provide an accurate, written wage notice to their employees.

66. Employees who were paid a salary were not given accurate notice of what their "regular rate" of pay would be.

67. Defendants offered health insurance benefits to employees who they deemed eligible.

68. Defendants negotiated the arrangement of health insurance benefits with eligible employees and included the agreed-upon arrangement in their employment offer letters.

69. The two arrangements available were 1) the employee participating in a Rowhouse's employee health plan or 2) Defendants giving the employee a stipend that could be used to pay for individually-purchased insurance costs.

70. When employees confronted Defendants about not receiving health insurance benefits they felt they were entitled to, employees were directed to Ms. Jaworski.

71. Ms. Jaworski responded by stating that the inquiring employees were not actually eligible for health insurance benefits, contrary to what they were previously told.

72. The particular terms of the health insurance policy were not included in the employee handbook nor posted for employees to read elsewhere.

73. Defendants offered paid vacation time as a benefit to certain eligible employees.

74. Paid vacation time was a feature of multiple employees' contractual agreements with Defendants.

75. When asked about paid vacation time, employees were directed to Ms. Jaworski to administer their claims.

76. Ms. Jaworski responded by stating that the inquiring employees were not actually eligible for paid vacation time, contrary to what they were previously told.

77. The particular terms of the vacation policy were not included in the employee handbook nor posted for employees to read elsewhere.

78. When asked, Ms. Jaworski did not give employees a clear answer as to what the terms of vacation policy were.

79. Employees regularly worked shifts with start and end times spread greater than ten hours apart.

80. Some serving staff would work both lunch and dinner shifts in the same day on a regular basis.

81. Cooks worked such shifts most commonly out of all Rowhouse's employees.

82. Defendants did not pay employees for an extra hour of work when employees worked such shifts.

83. When an employee asked Mr. Jaworski why Rowhouse did not pay for an extra hour of work for such shifts, he stated he would look into the legal requirements.

84. After this exchange, Defendants did not begin paying for an extra hour of work when employees worked such shifts.

85. On multiple occasions, after employees reported to Rowhouse for scheduled shifts, Mr. Tuohey sent the employees home after less than three hours of work.

86. On these occasions, Defendants would pay employees only for the time they were actually at work, which was less than three hours.

87. Upon information and belief, at all relevant times, Defendants failed to keep accurate and complete records of hours worked by Plaintiffs, tips owed to Plaintiffs, and tips actually distributed to Plaintiffs.

**Joshua Nuncio**

88. Mr. Nuncio was hired by Defendants in approximately October 2017 for the position of Bartender, before Rowhouse opened to the public.

89. Mr. Nuncio worked at Rowhouse for Defendants until approximately May 2018.

90. Mr. Nuncio was usually paid by Rowhouse at a "regular rate" of $7.50 per hour for regular dinner service and a "private event rate" of between $7.50 and $9.50 per hour.

91. Mr. Nuncio worked approximately two to three days per week, totaling approximately fifteen to twenty hours per week.

92. Mr. Nuncio's duties included, but were not limited to, mixing and serving drinks to customers, opening and closing customers' tabs, cleaning and prepping the bar area, taking customers' food orders, serving food to customers, counting the money in the cash register drawer, and filling out paperwork.

93. Mr. Nuncio never received from Defendants, nor signed, a notice of his wage rates and tip allowances being claimed by Defendants on its own separate form.

94. Mr. Nuncio was required to participate in the improper tip pool during private events. The tips from these tip pools were either kept by Defendants entirely or split arbitrarily between service employees, maintenance employees, and a managerial employee by Defendants.

95. When working private events, Mr. Nuncio was not informed of his rate of pay by Defendants. Mr. Nuncio never knew what hourly rate of pay to expect when working these events.

96. Mr. Jaworski decided what hourly rate to pay Mr. Nuncio after the weekend was over. Mr. Nuncio was not able to discern what rate he had actually been paid for these shifts.

97. Mr. Nuncio never received any indication from Defendants of how tips were split and distributed, and was discouraged by Mr. Jaworski from inquiring further into those methods.

98. Mr. Nuncio was responsible for counting the cash in the cash register drawer when he worked a closing shift.

99. When Mr. Nuncio closed to count the drawer and clean the bar, Mr. Tuohey instructed him that he must clock out before doing so. After he clocked out, he spent approximately thirty minutes for each applicable shift counting the cash in the drawer and filling out related paperwork.

100. Approximately three times during Mr. Nuncio's employment with Rowhouse, Mr. Tuohey called Mr. Nuncio in to work, but then sent Mr. Nuncio home within an hour after he arrived because the restaurant was not busy or too many employees were scheduled to work on that day.

101. Mr. Nuncio was not paid for a minimum of three hours at the minimum wage rate on these occasions.

**Ashley Seibert**

102. Ms. Seibert was offered the position of Front House Manager via an offer letter, dated
   February 8, 2018 and signed by Mark Jaworski.

103. Ms. Seibert's duties included supervising serving and barista staff, scheduling and
   planning private events, and helping Defendants with administrative tasks. Ms. Seibert
   would do personal service for tables and parties when demand so required.

104. Ms. Seibert accepted the offer for Front House Manager as described by the offer letter
   by signing the offer letter and returning it to Rowhouse.

105. Ms. Seibert actually began performing work for Rowhouse in approximately the middle
   of March 2018.

106. Ms. Seibert worked at Rowhouse until approximately the end of August 2018.

107. Ms. Seibert worked approximately sixty-six hours per week for Defendants from the
   middle of March 2018 until the middle of July 2018. She worked approximately fifty-six
   hours per week for Defendants from the middle of July 2018 to the end of August 2018.

108. Ms. Seibert's offer letter stated that she would be expected to work forty to fifty hours
   per week for Rowhouse.

109. Ms. Seibert was not compensated for the hours she worked in excess of fifty hours per
   week.

110. Ms. Seibert's offer letter stated that the offer had a total "value of $49,500 plus potential
   for incentive pay after six months."

111. Defendants paid Ms. Seibert a base annual salary of $46,500, distributed in twice-
   monthly payments. This was the base salary that was stated in the February 8, 2018 offer
   letter.

112. In the February 8, 2018 offer letter, Defendants also stated that Ms. Seibert was eligible for $3,000 annually in health insurance cost reimbursements. The value of this $3,000 annual reimbursement was included in the stated $49,500 value of the employment offer.

113. The offer letter also listed possible performance incentive payments, potentially totaling $2,125 annually. The $2,125 value of this benefit was not included in the stated $49,500 total value of the offer.

114. During the hiring process, Mr. Tuohey and Mr. Jaworski met with Ms. Seibert in person to discuss the terms of her employment.

115. At that meeting, Ms. Seibert discussed with Mr. Tuohey and Mr. Jaworski that she was already covered by an individually-purchased health insurance plan for which she incurred premium costs.

116. Mr. Tuohey and Mr. Jaworski stated to Ms. Seibert that she would be provided with a health insurance reimbursement for these costs in her biweekly paychecks upon the start of her employment.

117. Defendants never informed Ms. Seibert before or during her employment that they would require her to provide proof of a health insurance cost before she would become eligible for reimbursement payments.

118. Defendants never informed Ms. Seibert before or during her employment that they would require her to be employed for one year or more before she would become eligible for reimbursement payments.

119. Defendants did not pay Ms. Seibert any portion of the $3,000 annual health insurance cost reimbursement benefit it promised in her offer letter.

120. After Ms. Seibert resigned from her employment in August 2018, she asked Defendants to pay her the portion of the health care reimbursement benefit that she was owed.

121. Ms. Jaworski replied to this request via email and stated that Ms. Seibert was not owed any health care reimbursement because she did not provide proof of a cost and was employed for less than one year.

**Daniel Snyder**

122. Mr. Snyder was hired by Defendants for the position of Bartender in August 2017, before Rowhouse opened to the public.

123. Mr. Snyder worked at Rowhouse until approximately February 2018.

124. Mr. Snyder's hourly rate for regular service was $7.50 per hour from the time he was hired until September 2017.

125. When Mr. Snyder was a bartender for Defendants, his duties included, but were not limited to, mixing and serving drinks to customers, opening and closing customers' tabs, cleaning and prepping the bar area, taking customers' food orders, serving food to customers, counting the money in the cash register drawer, and filling out paperwork.

126. Mr. Snyder never received from Defendants, nor signed, a notice of his wage rates and tip allowances being claimed by Defendants on its own separate form.

127. Mr. Tuohey told Mr. Snyder was that he was being promoted to Bar Manager in September 2017 through an informal verbal conversation.

128. Mr. Snyder's hourly rate was raised to $8.50 per hour for regular service when he was told he was being promoted to Bar Manager.

129. Mr. Snyder never received any notice of this change in title, nor a notice of the change in pay, in writing.

130. Mr. Snyder's hourly rate was raised to $9.50 per hour for regular service in January
2018. He was informed of this raise in an email from Mr. Tuohey

131. When Mr. Snyder worked as a bar manager for Defendants, his duties included taking
inventories of bar products, prepping and stocking the bar for shifts and parties, creating
cocktail and beer menus, meeting with vendor representatives, and other regular
bartending duties.

132. Mr. Snyder did not have the authority to hire, fire, or discipline employees at Rowhouse
independent of Defendants.

133. At all relevant times, Mr. Snyder worked approximately sixty hours per week.
Approximately six to eight of these hours were off the clock and therefore not paid.

134. Mr. Snyder was paid between $7.50 to $9.50 per hour for private events.

135. When working private events, Mr. Tuohey did not inform Mr. Snyder of his rate of pay.

136. Mr. Jaworski decided what hourly rate to pay Mr. Snyder after the weekend was over.
Mr. Snyder was not able to discern what rate he had actually been paid for these shifts.

137. During private events, Mr. Snyder was required to participate in an improper tip pool.
The tips from these pools were either kept entirely by Defendants or improperly split
between service employees, maintenance employees, and a manager.

138. Mr. Tuohey and Mr. Jaworski required Mr. Snyder to perform various duties while
home and off the clock. Mr. Tuohey and Mr. Jaworski specifically told Mr. Snyder that
he should perform any work that he could do with a computer or phone while home and
off the clock.

139. Defendants required Mr. Snyder to do initial scheduling for Rowhouse while off the
clock at home. This work amounted to approximately one hour per week.

140. Mr. Tuohey also contacted Mr. Snyder via email and text message for help with Rowhouse-related business, such as placing orders and returning call to distributors for the restaurant while he was at home and off the clock. This amounted to approximately two hours per week.

141. Defendants also required Mr. Snyder to review sales and inventory reports while home and off the clock. This amounted to approximately two hours per week.

142. Defendants also required Mr. Snyder to work on menus and develop new recipes while at home and off the clock. This amounted to approximately one hour per week.

143. Mr. Snyder was responsible for counting the cash in the cash register drawer and for filling out paperwork at the end of his shifts.

144. When Mr. Snyder closed to count the drawer, clean the bar, and fill out paperwork, he was instructed by Mr. Tuohey and Mr. Jaworski that he had to clock out before doing so. After he clocked out, he spent approximately thirty minutes for each applicable shift counting the cash in the drawer and filling out related paperwork.

145. Defendants refused to pay Mr. Snyder at a rate of one and one-half times his regular rate of pay for hours worked beyond forty hours per week. At times, hours worked in excess of forty hours per week were paid at his regular rate, and at other times, were not paid at all.

146. Mr. Snyder worked shifts spanning more than ten hours approximately two times per week.

147. Mr. Snyder was not paid for an additional hour at the minimum wage for the days when there were more than ten hours between the beginning and the end of his shift.

**Maxamillian Lewis**

148. Mr. Lewis was hired by Defendants in approximately October 2017 for the position of Cook before Rowhouse opened to the public.

149. Mr. Lewis worked at Rowhouse until approximately July 2018.

150. Mr. Lewis' duties included, but were not limited to, cooking meals for customers, performing food and kitchen prep, cleaning kitchen work areas, and helping to develop menus.

151. Mr. Lewis was paid by Defendants on an hourly basis from his hire date until approximately May 2018 at a rate of $14.25 per hour.

152. Mr. Lewis never received from Defendants, nor signed, a notice of his wage rates on its own separate form.

153. From October 2017 to November 2017, Mr. Lewis frequently worked shifts that spanned greater than ten hours. Specifically, he worked shifts between ten and fourteen hours long approximately five to six days per week during this time period.

154. From November 2017 to May 2018, Mr. Lewis worked approximately forty to fifty hours per week for Defendants. During this time period, Mr. Lewis worked approximately one shift spanning between ten and twelve hours per week.

155. Mr. Lewis verbally asked Mr. Jaworski to pay him spread-of-hours pay. Mr. Jaworski stated he would look into the matter, but never followed up nor provided spread-of-hours pay.

156. In May 2018, Defendants switched Mr. Lewis to salary pay of $40,500 a year based on fifty-five hours per week.

157. Mr. Lewis's contract did not stipulate that his salary included overtime pay for hours worked over forty hours per week.

158. For the last week that Mr. Lewis worked, Defendants docked Mr. Lewis' pay because he did not work fifty-five or more hours per week.

159. After Mr. Lewis resigned from his position, he agreed to work two four-hour shifts for Defendants at his regular hourly rate, because they needed extra help. Mr. Lewis clocked in and out on the time clock for these shifts.

160. Defendants never paid Mr. Lewis for these two four-hour shifts.

161. Defendants stated to Mr. Lewis that he was entitled to paid vacation time. When Defendants decided to close the restaurant for one week, Mr. Lewis attempted to use vacation time so that he would be paid for this week. However, once Mr. Lewis requested pay for the used vacation time, Ms. Jaworski stated that Mr. Lewis was not entitled to paid vacation.

162. Two or three times, Mr. Tuohey required Mr. Lewis to report to work, but sent him home after approximately one hour. Mr. Lewis was paid less than three hours at the minimum wage rate on these occasions.

**Brent Esposito**

163. Mr. Esposito was hired by Defendants in October 2017 for the position of Cook before Rowhouse opened to the public.

164. Mr. Esposito worked at Rowhouse until approximately July 2018.

165. Mr. Esposito's duties included, but were not limited to, cooking meals for customers, performing food and kitchen prep, cleaning kitchen work areas, and helping with menu development.

166. Mr. Esposito was paid by Defendants on an hourly basis from his hire date until May 2018 at a rate of approximately $16.50 per hour.

167. Mr. Esposito never received from Defendants, nor signed, a notice of his wage rates on its own separate form.

168. Mr. Esposito worked approximately forty to fifty hours per week for Defendants from October 2017 to May 2018

169. From June 2018 to July 2018, Mr. Esposito worked approximately fifty-five hours per week for Defendants.

170. From October 2017 to November 2017, Mr. Esposito worked shifts that spanned between ten and fourteen hours long approximately five to six days per week.

171. From November 2017 to July 2018, Mr. Esposito worked shifts spanning greater than ten hours approximately one to two times per week.

172. Defendants did not pay Mr. Esposito for an extra hour of work on these occasions.

173. In May 2018, Defendants switched Mr. Esposito to salary pay of $40,500 a year, based on an expected fifty-five hours worked per week.

174. Mr. Esposito's contract did not stipulate that his salary included overtime pay for hours worked over forty hours per week.

175. In July 2018, Mr. Esposito attempted to use some of the paid vacation that Defendants offered to him in his contract.

176. When he inquired about using this benefit, Mr. Esposito was referred to Ms. Jaworski who said that Mr. Esposito had not accumulated enough paid time to qualify for the paid time off.

177. In his initial employment contract, Defendants promised Mr. Esposito an annual benefit of $2,000 for health care costs in his employment contract. Defendants told Mr. Esposito that a prorated portion of this annual benefit would be distributed to him in his biweekly paychecks.

178. Defendants never told Mr. Esposito nor provided him with a written policy that stated he would be required to provide Defendants with proof of a health insurance cost before he would begin to receive the prorated benefit in his paychecks.

179. Defendants never paid Mr. Esposito any portion of this promised benefit.

**Melanie Cheney**

180. Ms. Cheney was first hired at Rowhouse for the position of Cook in approximately September 2016 before Rowhouse opened to the public, but left after a few months when it became apparent the restaurant would not be opening for some time.

181. Ms. Cheney went back to work at Rowhouse in May 2017 on a part-time basis.

182. While Ms. Cheney was working for Defendants on a part-time basis, Defendants paid her a "regular rate" of $15 per hour.

183. During this time, her duties included working with the Executive Chef to develop recipes and menus for when the restaurant would eventually open.

184. In September 2017, Ms. Cheney then signed a contract for a salary of $40,000 per year. The contract stipulated that this salary was based upon forty-five to fifty hours of work per week.

185. Ms. Cheney never received from Defendants, nor signed, a notice of her wage rates on its own separate form.

186. From October 2017 to January 2018, Ms. Cheney worked approximately eighty hours per week.

187. Ms. Cheney's duties included doing monthly inventory, cooking on the line, preparing for service, or expediting during service. A small portion of her time was spent ordering produce for the restaurant.

188. From October 2017 to January 2018, her hourly pay was $9.61 per hour, which was below the New York State minimum wage.

189. From January 2018 until April 2018, Ms. Cheney worked approximately sixty-five to seventy hours per weeks on the same salary of $40,000 per year.

190. Ms. Cheney's duties remained unchanged from when Defendants first opened the restaurant.

191. In July 2018, Ms. Cheney received a raise to $45,000 a year. Defendants did not grant this raise until prompted by repeated questions from Ms. Cheney.

192. From April to August 2018, Ms. Cheney worked fifty-five to sixty hours per week.

193. Ms. Cheney left Rowhouse in August 2018.

194. During all relevant time periods, Ms. Cheney worked shifts that spanned between ten and sixteen hours long approximately five to six days per week.

195. Ms. Cheney was not paid for an extra hour of work on these occasions.

**Kira Allen**

196. Ms. Allen was hired by Rowhouse in approximately October 2017 for the position of Bartender, before Rowhouse opened to the public.

197. As a bartender, Ms. Allen's duties included, but were not limited to, mixing and serving drinks to customers, opening and closing customers' tabs, cleaning and prepping the bar

area, counting the money in the cash register drawer, taking customers' food orders, serving food to customers, and filling out paperwork.

198. While she was a bartender. Ms. Allen never received from Defendants, nor signed, an accurate notice of her wage rates and tip allowances being claimed by Defendants on its own separate form.

199. Ms. Allen was promoted to Bar Manager in February of 2018.

200. As a bar manager, Ms. Allen's duties included taking inventories of bar products, prepping and stocking the bar for shifts and parties, creating cocktail and beer menus, and other regular bartending duties.

201. Ms. Allen did not have the authority to hire, fire, or discipline employees at Rowhouse independent of Defendants.

202. Ms. Allen worked at Rowhouse for Defendants until approximately May 2018.

203. Ms. Allen was usually paid by Defendants at $11 per hour when she was a bartender and $13 per hour when she was bar manager. She was usually paid between $7.50 and $9.50 per hour for private events.

204. Ms. Allen was required to participate in the improper tip pool during private events. Defendants would sometimes keep all the money from these tip pools, or other times, would split the tips between service employees, maintenance employees, and managers who were ineligible to participate in the pool.

205. When working private events, Ms. Allen was not informed of her rate of pay by Defendants.

206. Mr. Jaworski decided what hourly rate to pay Ms. Allen after the weekend was over. Ms. Allen was not able to discern what rate she had actually been paid for these shifts.

207. When Ms. Allen asked Mr. Tuohey about what she was going to be paid for working private events she was repeatedly brushed off. On one occasion, Mr. Tuohey used lewd language to tell her to stop asking him about it.

208. When Ms. Allen gave notice that she was leaving, Mr. Tuohey asked if it had to do with the tipping policy for private events and told her that they were planning on changing that policy shortly.

209. At all relevant times, Ms. Allen regularly worked approximately forty-five hours per week. Forty of those hours were worked on the clock and the remaining five hours were worked off the clock.

210.  Ms. Allen received no pay for the work she performed in excess of forty hours per week.

211. Mr. Tuohey told Ms. Allen that, when her on-the-clock time reached forty hours in one week, she should clock herself out and complete her tasks off the clock so as not to trigger overtime pay. Ms. Allen complied with this direction.

212. During most weeks, Ms. Allen would work from home at the direction of Mr. Tuohey for approximately two and a half hours per week. During this time, she completed input of inventory and fielded work-related phone calls. Ms. Allen was not compensated for this time by Defendants.

213. Ms. Allen was responsible for counting the cash in the cash register drawer and for filling out paperwork at the end of her shifts.

214. When Ms. Allen closed to count the drawer, clean the bar, and fill out paperwork, she was instructed by Mr. Tuohey and Mr. Jaworski that she had to clock out before doing so. After she clocked out, she spent approximately thirty minutes for each shift counting the

cash in the drawer and filling out related paperwork. This amounted to approximately two and a half hours per week.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### FEDERAL OVERTIME (FAIR LABOR STANDARDS ACT)
(Plaintiffs Snyder, Allen, Lewis, Esposito, and Cheney against Defendants)

215. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

216. At all relevant times, Delaware 483 LLC, Myriah Jaworski, Sean Tuohey, and Mark Jaworski were joint and/or integrated employers within the meaning of 29 U.S.C. § 203(d) and 29 C.F.R. § 791.2.

217. At all relevant times, all Plaintiffs Snyder, Allen, Lewis, Esposito, and Cheney were employees within the meaning of 29 U.S.C. § 203(e)(1).

218. Defendants failed to pay Plaintiffs Snyder, Allen, Lewis, Esposito, and Cheney overtime for all hours that they worked in excess of 40 hours per week for each week in violation of 29 U.S.C. § 207(a)(1).

219. Defendants' violations of FLSA were willful.

220. As a result of these violations, Plaintiffs Snyder, Allen, Lewis, Esposito, and Cheney suffered damages.

221. Defendants are jointly and severally liable to the Plaintiffs for these violations of their rights under federal law.

222. Plaintiffs are entitled to an award of damages for unpaid overtime, plus liquidated damages in an equal amount and interest, as well as attorneys' fees, in an amount to be determined at trial. 29 U.S.C. § 216(b).

## SECOND CLAIM FOR RELIEF
## FEDERAL MINIMUM WAGE (FLSA)
(Plaintiffs Nuncio, Snyder, Allen, and Cheney against Defendants)

223. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

224. At all relevant times, Delaware 483 LLC, Myriah Jaworski, Sean Tuohey, and Mark Jaworski were joint and/or integrated employers within the meaning of 29 U.S.C. § 203(d) and 29 C.F.R. § 791.2.

225. At all relevant times, all Plaintiffs were employees within the meaning of 29 U.S.C. § 203(e)(1).

226. Defendants failed to pay Mr. Nuncio, Mr. Snyder, Ms. Allen, Mr. Lewis, and Ms. Cheney the minimum hourly wage due to them in violation of 29 U.S.C. § 206(a)(1)(c).

227. As a result of these violations, Mr. Nuncio, Mr. Snyder, Ms. Allen, Mr. Lewis, and Ms. Cheney suffered damages.

228. Defendants are jointly and severally liable to Mr. Snyder, Ms. Allen, Mr. Lewis, and Ms. Cheney for these violations of their rights under federal law.

229. Defendants' actions were willful.

230. Plaintiffs are entitled to an award of damages for unpaid wages, plus liquidated damages in an equal amount and interest, as well as attorneys' fees, in an amount to be determined at trial. 29 U.S.C. § 216(b).

### THIRD CLAIM FOR RELIEF
### NEW YORK STATE LABOR LAW – OVERTIME
(Plaintiffs Snyder, Allen, Lewis, Esposito, and Cheney against Defendants)

231. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

232. Plaintiffs bring this claim under Article 19 § 652 of the Minimum Wage Act against all Defendants.

233. At all relevant times, all Defendants were "employers" within the meaning of N.Y. Lab. L. § 651(6).

234. At all relevant times, Defendants employed Plaintiffs within the meaning of N.Y. Lab. L. § 651.

235. At all relevant times, Plaintiffs were "employees" of Defendants within the meaning of N.Y. Lab. L. § 651(5).

236. Defendants failed to pay overtime wages due to Plaintiffs Snyder, Allen, Lewis, Esposito, and Cheney for hours worked in excess of forty per week in each week. 12 N.Y.C.R.R. § 142-2.2.

237. As a result, Plaintiffs Snyder, Allen, Lewis, Esposito, and Cheney suffered damages.

238. Defendants are jointly and severally liable to Plaintiffs for these violations of their rights under state law.

239. Plaintiffs are entitled to an award of damages for unpaid overtime, plus liquidated damages in an equal amount and interest, as well as attorneys' fees, in an amount to be determined at trial. N.Y. Lab. L. § 652.

## FOURTH CLAIM FOR RELIEF
## NEW YORK STATE LABOR LAW - MINIMUM WAGE
(Plaintiffs Nuncio, Snyder, Allen, Lewis, and Cheney against Defendants)

240. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

241. At all relevant times, all Defendants were "employers" within the meaning of N.Y. Lab. L. § 651(6).

242. At all relevant times, Defendants employed Plaintiffs within the meaning of N.Y. Lab. L. § 651.

243. At all relevant times, Plaintiffs were "employees" of Defendants within the meaning of N.Y. Lab. L. § 651(5).

244. Defendants failed to pay wages due to Plaintiffs Nuncio, Snyder, Allen, Lewis, and Cheney for work performed in the State of New York at the state minimum wage, in violation of N.Y. Lab. L. § 652.

245. As a result of these violations, Plaintiffs Nuncio, Snyder, Allen, Lewis, and Cheney suffered damages.

246. The Defendants are jointly and severally liable to Plaintiffs for these violations of their rights under state law.

247. Plaintiffs are entitled to an award of damages for unpaid wages, plus liquidated damages in an equal amount and interest, as well as attorneys' fees, in an amount to be determined at trial. N.Y. Lab. L. § 652.

## FIFTH CLAIM FOR RELIEF
### NEW YORK STATE LABOR LAW – UNPAID WAGES
(Plaintiffs Nuncio, Snyder, Allen, and Lewis, against Defendants)

248. Plaintiffs repeats and re-alleges the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

249. At all relevant times, Defendants Delaware 483 LLC, Mark Jaworski, Sean Tuohey, and Myriah Jaworski were "employers" within the meaning of N.Y. Lab. L. § 651(6).

250. At all relevant times, Defendants employed Mr. Nuncio, Mr. Snyder, Ms. Allen, and Mr. Lewis within the meaning of N.Y. Lab. L. § 651(6). At all relevant times, Plaintiffs were employees of Defendants within the meaning of N.Y. Lab. L. § 651(5).

251. Defendants failed to pay Mr. Nuncio, Mr. Snyder, Ms. Allen, and Mr. Lewis for all hours worked in violation of N.Y. Lab. L. § 191.

252. As a result, Mr. Nuncio, Mr. Snyder, Ms. Allen, and Mr. Lewis suffered damages.

253. Defendants are jointly and severally liable to Plaintiffs for these violations of their rights under state law.

254. Mr. Nuncio, Mr. Snyder, Ms. Allen, and Mr. Lewis are entitled to an award of damages for unpaid wages and unpaid overtime, plus liquidated damages in an equal amount and interest, as well as attorneys' fees, in an amount to be determined at trial. N.Y. Lab. L. § 198 (1-a), 663(1).

## SIXTH CLAIM FOR RELIEF
### NEW YORK STATE LABOR LAW - SPREAD-OF-HOURS
(Plaintiffs Snyder, Lewis, Esposito, and Cheney against Defendants)

255. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

256. At all relevant times, all Defendants were "employers" within the meaning of N.Y. Lab. L. § 651(6).

257. At all relevant times, Defendants employed Plaintiffs within the meaning of N.Y. Lab. L. § 651.

258. At all relevant times, Plaintiffs were "employees" of Defendants within the meaning of N.Y. Lab. L. § 651(5).

259. Defendants failed to pay spread-of-hours wages due to Plaintiffs Snyder, Lewis, Esposito, and Cheney in violation of 12 N.Y.C.R.R. § 142.24.

260. As a result, Plaintiffs Snyder, Lewis, Esposito, and Cheney suffered damages.

261. Defendants are jointly and severally liable to Plaintiffs for these violations of their rights under state law.

262. Plaintiffs are entitled to an award of damages for unpaid spread-of-hours wages, plus liquidated damages in an equal amount and interest, as well as attorneys' fees, in an amount to be determined at trial. N.Y. Lab. L. § 652.

**SEVENTH CLAIM FOR RELIEF**
**NEW YORK LABOR LAW - WAGE NOTIFICATION**
(Plaintiffs Nuncio, Snyder, Allen, Lewis, Esposito, and Cheney against Defendants)

263. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

264. At all relevant times, all Defendants were "employers" within the meaning of N.Y. Lab. L. § 651(6).

265. At all relevant times, Defendants employed Plaintiffs within the meaning of N.Y. Lab. L. § 651.

266. At all relevant times, Plaintiffs were "employees" of Defendants within the meaning of N.Y. Lab. L. § 651(5).

267. Defendants failed to properly notify Plaintiffs Nuncio, Snyder, Allen, Lewis, Esposito, and Cheney of the rate of pay and any allowances—including a tip credit—the Defendants were taking. N.Y. Lab. L. § 195(1)(a).

268. Defendants failed to notify Plaintiffs Nuncio, Snyder, Allen, Lewis, Esposito, and Cheney in writing of any changes to their wage rates at least seven calendar days prior to the time of such changes. N.Y. Lab. L. § 195(2).

269. Defendants are jointly and severally liable to Plaintiffs Nuncio, Snyder, Allen, Lewis, Esposito, and Cheney for these violations of their rights under state law.

270. Plaintiffs are entitled to an award of $50 for every workday on which this violation occurred up to $5000. N.Y. Lab. L. § 198.

**EIGHTH CLAIM FOR RELIEF**
**NEW YORK LABOR LAW - CALL-IN PAY**
(Plaintiffs Nuncio and Lewis against Defendants)

271. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

272. At all relevant times, all Defendants were "employers" within the meaning of N.Y. Lab. L. § 651(6).

273. At all relevant times, Defendants employed Plaintiffs within the meaning of N.Y. Lab. L. § 651.

274. At all relevant times, Plaintiffs were "employees" of Defendants within the meaning of N.Y. Lab. L. § 651(5).

275. Defendants failed to pay call-in pay due to Plaintiffs Nuncio and Lewis in violation of 12 N.Y.C.R.R. § 146.15.

276. As a result, Plaintiffs Nuncio and Lewis suffered damages.

277. Defendants are jointly and severally liable to Plaintiffs for these violations of their rights under state law.

278. Plaintiffs are entitled to an award of damages for unpaid call-in pay, plus liquidated damages in an equal amount and interest, as well as attorneys' fees, in an amount to be determined at trial. N.Y. Lab. L. § 198.

**NINTH CLAIM FOR RELIEF**
**BREACH OF CONTRACT- HEALTH INSURANCE**
(Plaintiffs Seibert and Esposito against Defendants)

279. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

280. The employment agreements between Plaintiffs Seibert and Esposito and Defendants are valid and enforceable contracts.

281. Plaintiffs Seibert and Esposito have fully performed or tendered all performance required under the employment agreements.

282. Defendants have breached their obligations to Plaintiffs Seibert and Esposito as set forth in the employment agreements by failing to pay Plaintiffs any portion of their health insurance reimbursement benefit.

283. Plaintiffs Seibert and Esposito are entitled to recover damages resulting from Defendants' failure to pay any portion of the health insurance reimbursement benefit, pursuant to terms of the employment agreements.

**TENTH CLAIM FOR RELIEF**
**BENEFITS OR WAGE SUPPLEMENTS**
(Plaintiff Esposito against Defendants)

284. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

285. At all relevant times, all Defendants were "employers" within the meaning of N.Y. Lab. L. § 651(6).

286. At all relevant times, Defendants employed Plaintiff within the meaning of N.Y. Lab. L. § 651.

287. At all relevant times, Plaintiff was an "employee" of Defendants within the meaning of N.Y. Lab. L. § 651(5).

288. Defendants were party to an agreement to pay Plaintiff Esposito for health insurance costs.

289. Health benefits are "benefits or wage supplements" within the meaning of N.Y. Lab. L. § 198-c.

290. Defendants neglected or refused to pay the amount or amounts necessary to provide such benefits or furnish such supplements within thirty days after such payments were required to be made in violation of N.Y. Lab. L. § 198-c.

291. As a result, Plaintiff Esposito suffered damages.

292. Defendants are jointly and severally liable to Plaintiff Esposito for this violation of his rights under state law.

293. Plaintiff Esposito is entitled to an award of damages for unpaid health insurance benefits plus liquidated damages in an equal amount and interest, as well as attorneys' fees, in an amount to be determined at trial. N.Y. Lab. L. § 198.

## ELEVENTH CLAIM FOR RELIEF
## BREACH OF CONTRACT- ADDITIONAL COMPENSATION
### (Plaintiff Ashley Seibert against Defendants)

294. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

295. The employment agreement between Plaintiff Seibert and Defendants is a valid and enforceable contract.

296. Plaintiff Seibert has fully performed or tendered all performance required under the employment agreement.

297. Defendants have breached their obligation to Plaintiffs Seibert as set forth in the employment agreement by failing to pay Plaintiff additional compensation for hours worked in excess of 50 hours per week.

298. Plaintiff Seibert is entitled to recover damages resulting from Defendants' failure to pay additional compensation for hours worked in excess of 50 hours per week.

## TWELVTH CLAIM FOR RELEIF
## UNJUST ENRICHMENT
### (Plaintiffs Nuncio, Snyder, Allen, Lewis, Seibert, and Cheney against Defendants)

299. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint, as if fully set forth herein.

300. As a result of Plaintiffs Nuncio, Snyder, Allen, Lewis, Seibert and Cheney's uncompensated work, Defendants have been unjustly enriched at the expense of Plaintiffs Nuncio, Snyder, Allen, Lewis, Seibert and Cheney.

301. In light of the foregoing, equity and good conscience require restitution.

302. Plaintiffs Nuncio, Snyder, Allen, Lewis, Seibert and Cheney are entitled to recover

damages resulting from Defendants being unjustly enriched by Plaintiffs' work, as well

as interest and attorneys' fees in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Award Plaintiffs Snyder, Allen, Lewis, Esposito, and Cheney monetary damages for

unpaid overtime, plus liquidated damages in an equal amount and interest, as provided by

the F.L.S.A., 29 U.S.C. § 216(b), in an amount to be determined at trial;

b. Award Plaintiffs Nuncio, Snyder, Allen, Lewis, Esposito, and Cheney monetary damages

for unpaid wages, plus liquidated damages in an equal amount and interest, as provided

by the F.L.S.A., 29 U.S.C. § 216(b), in an amount to be determined at trial;

c. Award Plaintiffs Snyder, Allen, Lewis, Esposito, and Cheney monetary damages for

unpaid overtime, plus liquidated damages in an equal amount and interest, as provided by

12 N.Y.C.R.R. § 142-2.2, in an amount to be determined at trial;

d. Award Plaintiffs Nuncio, Snyder, Allen, Lewis, Esposito, and Cheney monetary damages

for unpaid wages, plus liquidated damages in an equal amount and interest, as provided

by N.Y. Lab. L. § 652, in an amount to be determined at trial;

e. Award Plaintiffs Nuncio, Snyder, Allen, and Lewis monetary damages for unpaid wages,

plus liquidated damages in an equal amount and interest, as provided by N.Y. Lab. L. §

191 in an amount to be determined at trial;

f. Award Plaintiffs Snyder, Allen, Lewis, Esposito, and Cheney monetary damages for

unpaid spread-of-hours wages, plus liquidated damages in an equal amount and interest,

as provided by 12 N.Y.C.R.R. § 142-2.4., in an amount to be determined at trial;

g.   Award all Plaintiffs monetary damages for failing to provide them with notice of pay, as provided by N.Y. Lab. L. § 195;

h.   Award Plaintiffs Nuncio and Lewis monetary damages for unpaid call-in pay plus liquidated damages in an equal amount and interest, as provided by 12 N.Y.C.R.R. § 146.15;

i.   Award Plaintiffs Seibert and Esposito monetary damages for failing to pay health insurance reimbursements, which breached Plaintiffs' employment agreements;

j.   Award Plaintiff Esposito monetary damages for unpaid benefits and wage supplements, plus liquidated damages in an equal amount and interest, as provided by N.Y. Lab. L. § 198-c;

k.   Award Plaintiff Seibert monetary damages for failing to pay her for hours worked in excess of fifty hours per week, which breached her employment agreement, plus interest and attorneys' fees;

l.   Award Plaintiffs Nuncio, Snyder, Allen, Lewis, Seibert, and Cheney monetary damages for unjust enrichment, plus interest and attorneys' fees;

m.   Award attorneys' fees and costs to Plaintiffs for legal services provided by the University at Buffalo School of Law's Community Justice Clinic, pursuant to 29 U.S.C. § 216(b), N.Y. Lab. L. § 652; and

n.   Grant such additional and further relief as the Court deems just and proper.

___/s/ A. Nicole Hallett_____
A. Nicole Hallett, Esq.
Emily Staebell, Student Attorney
Patrick Hoover, Student Attorney
Community Justice Clinic
University at Buffalo School of Law
507 O'Brian Hall, North Campus
Buffalo, NY 14260

(716) 645-2167
nicole@buffalo.edu
*Attorneys for Plaintiffs*